❏ Original ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No. 20-1048M(NJ) |
| A forest green Apple iPhone 11 Pro Max and a Smasung ) | |
| Galaxy S20 Ultra cellphone, currently located at HIDTA, 801 ) | |
| W. Michigan Avenue, Milwaukee, Wisconsin, more fully ) | |
| described in Attachment A ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   October 22, 2020   *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Nancy Joseph   .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*  ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:   10/8/2020 @ 2:40 p.m.

*Judge's signature*

City and state:   Milwaukee, WI   Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

The property to be searched is described as follows:

1.      a forest green Apple iPhone 11 Pro Max, with an unknown model and serial number, hereinafter referred to as "**Device 1**"; and

2.      a Samsung Galaxy S20 Ultra cellphone, hereinafter referred to as "**Device 2**".

**Device 1** and **Device 2** are currently located at High Intensity Drug Trafficking Area, 801 W. Michigan Avenue, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Device 1** and **Device 2** for the purpose of identifying the electronically stored information described in Attachment B.

1

# ATTACHMENT B

1.      All records on **Device 1** and **Device 2** described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957, and involve Julian SANCHEZ, including, but not limited to:

   a.   lists of customers and related identifying information;

   b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.   any information related to co-conspirators and sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d.   any information recording schedule or travel;

   e.   all bank records, checks, credit card bills, account information, and other financial records;

   f.   Photographs and/or video depicting possession of drugs;

   g.   Any evidence related to either the ownership, purchase, or possession of drugs; and

   h.   Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.      Evidence of user attribution showing who used or owned **Device 1** and **Device 2** at the time the things described in this warrant were created, edited, or

1

deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A forest green Apple iPhone 11 Pro Max and a Smasung Galaxy<br>S20 Ultra cellphone, currently located at HIDTA, 801 W. Michigan<br>Avenue, Milwaukee, Wisconsin, more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)   Case No.   20-1048M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ❏ contraband, fruits of crime, or other items illegally possessed;

    ☑ property designed for use, intended for use, or used in committing a crime;

    ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b),<br>& 846; 18 U.S.C. §§ 922(g),<br>924(c), 1956, and 1957 | Drug trafficking; Unlawful use of communications facilities; Possession of firearms<br>in furtherance of drug trafficking; unlawful user in possession, laundering of<br>monetary instruments, and conspiracy to do so |

The application is based on these facts:

See attached affidavit.

    ❏ Continued on the attached sheet.

    ❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Aaron Hoppe, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 10/8/2020 _____

_____
*Judge's signature*

City and state: Milwaukee, WI

Nancy Joseph
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Aaron Hoppe, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am employed as a Detective with the Waukesha County Sheriff's Department and have been a law enforcement officer for over thirteen years.  I have been a Detective for over eight years and have been assigned to the High Intensity Drug Trafficking Area (HIDTA) since June of 2020.  I was previously assigned to the Waukesha County Metropolitan Drug Enforcement Group as a Detective for over two years.  I am also a Task Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since June of 2020.  As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and 21 U.S.C. § 878, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      I have received basic criminal investigative training and attended numerous DEA narcotic training courses.  In the course of my work, I have become knowledgeable with the enforcement of state and federal laws pertaining to

1

narcotics trafficking. I have participated in drug trafficking investigations conducted by the Milwaukee Police Department, Homeland Security Investigations (HSI), the Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI), the United States Postal Inspection Service (USPIS), and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

4. I am familiar with various methods of smuggling and trafficking controlled substances and its proceeds. I am also familiar with methods used to by traffickers to evade detection of both the controlled substances and its proceeds. I have received training in the investigation of and am knowledgeable in investigations pertaining to drug trafficking, illegal firearm possession and trafficking, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.

5. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous

2

federal and state search warrants for narcotic related offenses, which have resulted in the seizure of controlled substances, firearms, United States currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

6.     Through training, experience, and discussions with other experienced agents:

a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d.     I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution.  Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done

3

using a telephone number and then are unable to put another line in the name of that subscriber; I also know that drug dealers tend to frequently change phone numbers in an attempt to avoid law enforcement detection.

e.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

f.      I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

g.      I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

h.      I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency,

4

financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

i.      I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as to conduct drug trafficking activities;

j.      I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency; and

k.      I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization.

7.     Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

8.     To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs. I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

9.     The facts in this affidavit come my personal observations, my training and experience, my review of oral and written reports of other law enforcement officers participating in this and related investigations, records, documents, and

6

other evidence obtained during this investigation. The investigation to date has involved traditional law enforcement methods, including, but not limited to confidential informants, interviews, documentary evidence, phone analysis, physical surveillance, and search warrants.

10. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

11. The property to be searched is described as follows:

a. a forest green Apple iPhone 11 Pro Max, with an unknown model and serial number, hereinafter referred to as "**Device 1**"; and

b. a Samsung Galaxy S20 Ultra cellphone, hereinafter referred to as "**Device 2**."

12. **Device 1** and **Device 2** are currently located at High Intensity Drug Trafficking Area at 801 W. Michigan Avenue, Milwaukee, Wisconsin.

13. The applied-for warrant would authorize the forensic examination of **Device 1** and **Device 2** for the purpose of identifying electronically stored data more particularly described in Attachment B.

7

## SUMMARY OF PROBABLE CAUSE

14.    In September 2018, members of North Central High Intensity Drug Trafficking Area (HIDTA) and the Drug Enforcement Administration (DEA) initiated an investigation into individuals distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere.  Law enforcement authorities identified the individual spearheading the DTO in Milwaukee, Wisconsin, as Louis R. PEREZ III (PEREZ III) (a/k/a "Ocho," and a/k/a "Eight Ball"), who has been identified by law enforcement as a Mexican Posse gang member. Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian SANCHEZ (SANCHEZ) and Miguel SARABIA (SARABIA), SANCHEZ's father, who reside in California, supplied the PEREZ III DTO with bulk marijuana, marijuana edibles[1], marijuana oils/waxes,[2] marijuana vape cartridges,[3] and/or other controlled substances.

---

[1]    Edibles are food items containing THC that are intended for human consumption.  Edibles containing THC are Schedule I controlled substances.

[2]    Marijuana wax is a resin concentrate that is extracted from cannabis oil. Likewise, marijuana wax is a Schedule I controlled substance.

[3] Case agents believe that the PEREZ III DTO is purchasing pen vaporizer parts individually, filling and/or assembling the cartridges with THC oil shipped from California, and placing the cartridges in the "West Coast Cure CUREpen" and "Rove" boxes. "West Coast Cure CUREpen" appears to be a top-rated, high-end brand for THC vape cartridges that have been susceptible to outerfeiting issues.  THC, or tetrahydrocannabinol, is the primary psychoactive component of marijuana, a Schedule I Controlled Substance.

8

15.     SANCHEZ obtained hundreds of pounds of marijuana from growers in northern California. SANCHEZ, along with his relative, Gabriel MATTESON (MATTESON), packaged and sent the marijuana through FedEx and UPS to numerous DTO addresses in the greater Milwaukee, Wisconsin, area. This has been confirmed by the seizure and search of two packages (one FedEx and one UPS), which contained marijuana and THC oil. Additionally, the investigation has revealed that the PEREZ III DTO manufactured "vape cartridges" containing THC oil, and that SANCHEZ and/or SARABIA also imported supplies, to include vape cartridge tubes and boxes, which were then filled and assembled by DTO members once in Milwaukee. This was confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes.

16.     The PEREZ III DTO members then collected the packages that were sent to various DTO addresses in the City of Milwaukee, and transported these packages to various stash locations. Thereafter DTO members prepared the marijuana and marijuana-related products for distribution. PEREZ III distributed the marijuana and marijuana related products to mid-level distributors of the DTO in Milwaukee, Wisconsin. These mid-level distributors subsequently distributed the marijuana and marijuana related products to numerous customers in the greater Milwaukee, Wisconsin, area at times using the third-party application Snapchat, as well as other third-party telephone applications.

9

17.     Marijuana vape cartridges were then assembled by the thousands on behalf of the PEREZ III DTO by DTO members who are primarily connected to XINA YANG (XINA).  JASMINE PEREZ (JASMINE), PEREZ III's sister, as well as XINA, assist the DTO with laundering drug proceeds. Furthermore, JASMINE and Hector ARENAS maintained stash locations for the DTO.

18.     The above-referenced court authorized interceptions, combined with physical surveillance, reflect that the PEREZ III DTO received at least 200 packages, believed to contain marijuana and THC oil, which were delivered by FedEx and UPS, to at least eight different addresses.

19.     Based upon their training, experience, and familiarity with the investigation, case agents believe that the PEREZ III DTO has distributed in excess of 1,000 kilograms of marijuana, a Schedule I controlled substance.

20.     Upon receipt and distribution of the controlled substances, the DTO either mailed packages believed to contain bulk currency in the form of drug proceeds to SANCHEZ or enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, case agents believe SARABIA traveled to Milwaukee, Wisconsin, to obtain drug proceeds.

21.     Since at least December 11, 2019, PEREZ III and XINA, PEREZ III's live-in girlfriend who assists PEREZ III with DTO activities, mailed at least 87 packages, believed to contain bulk U.S. currency, to SANCHEZ in California, using USPS. As of July 2020, the bulk currency packages were mailed to (1) SANCHEZ's grandparent's house, located at 3226 E. Valley View Avenue, West Covina,

California; (2) A USPS postal annex located in Los Gatos, California; and, (3) SANCHEZ's residence in Costa Mesa, California. Later in the investigation, the DTO employed the use of couriers to send the bulk currency back to SANCHEZ.

22.     On April 16, 2020, two parcels that PEREZ III mailed to SANCHEZ were searched pursuant to sneak and peek warrants. Upon the execution of the search warrants, it was determined that each parcel contained $20,000 in U.S. currency. Although PEREZ III and/or XINA use alias and addresses with no current ties to them to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications have confirmed their association with the packages.

**A.     Interception of DTO Wire and Electronic Communications**

23.     On March 19, 2020, the Honorable Lynn Adelman issued an Order authorizing the interception of wire and electronic communications over telephone number (626) 733-6730 (Target Telephone 1), used by PEREZ III. The interception of Target Telephone 1 occurred from March 20, 2020, through April 18, 2020.

24.     On April 10, 2020, the Honorable Lynn Adelman issued an Order authorizing the interception of wire and electronic communications over telephone number (414) 499-1861 (Target Telephone 3), used by PEREZ III, and telephone number (626) 629-9932 (Target Telephone 4), used by XINA. The interception of Target Telephones 3 and 4 occurred from April 10, 2020, through May 9, 2020.

25.     On April 24, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 1, used by PEREZ III. The interception of Target Telephone 1 occurred from April 24, 2020, through May 23, 2020.

26.     On May 15, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephones 1 and 3, used by PEREZ III, the continued interception of wire communications over Target Telephone 4, used by XINA, and the initial interception of wire communications over telephone number (213) 700-0559 (Target Telephone 5), used by SANCHEZ. The interceptions of Target Telephones 1, 3, 4, and 5 occurred from May 15, 2020, through June 13, 2020.

27.     On June 24, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interceptions of wire and electronic communications over Target Telephone 1, used by PEREZ III, the continued interception of wire communications over Target Telephone 4, used by XINA, the continued wire communications and initial electronic communications over Target Telephone 5, used by SANCHEZ, the initial wire and electronic communications over telephone number (562) 380-9506  (Target Telephone 6), used by SANCHEZ, and the initial wire communications over telephone number (949) 534-2677 (Target Telephone 7), used by Miguel SARABIA. The interceptions of Target Telephones 1, 4, 5, 6, and 7 occurred from June 24, 2020, through July 23, 2020.

12

28.     On August 4, 2020, the Honorable Lynn Adelman issued an Order authorizing the initial interception of wire and electronic communications over Snapchat account "Midwest_connect," used by PEREZ III. The interceptions of Snapchat account Midwest-connect occurred from August 5, 2020, through September 2, 2020.

29.     On August 26, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephones 5 and 6, used by SANCHEZ, the continued interception of wire communications and initial interception of electronic communications over Target Telephone 7, used by SARABIA, and the initial interception of wire communications over telephone number (562) 306-8581 (Target Telephone 8), used by SANCHEZ. The interceptions of Target Telephones 6, 7, and 8 began on August 26, 2020, and are scheduled to end on September 24, 2020. Interceptions did not begin over Target Telephone 5 due to the changed IMEI number.

30.     On August 28, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 5.  Interceptions began on August 28, 2020, and are scheduled to end on September 26, 2020.

**B.      DTO Received Controlled Substances Via Shipping Companies.**

31.     Intercepted communications over Target Telephones 1 and 4, as well as contemporaneous surveillance of DTO members, have revealed that PEREZ III

13

coordinates the shipment of packages containing suspected controlled substances to various DTO associate residences in Milwaukee, Wisconsin.

32.     These addresses include but are not limited to 170 W. Crawford Avenue, Milwaukee, Wisconsin (prior residence of Jose ALVARADO and Shayla KNUEPPEL); 2257 S. 30th Street, Milwaukee, Wisconsin (residence of Mercedes HERBERT GONZALEZ); 3624 W. Burnham Street, Milwaukee, Wisconsin (prior residence of MA YANG (MA) and Michael BUB); 3344 S. 17th Street, Milwaukee, Wisconsin (prior residence of Michele HART); and 420 E. Morgan Avenue, Milwaukee, Wisconsin (prior residence of Louis PEREZ JR. and current residence of MA, BUB, and other YANG family members).  Furthermore, interceptions over Target Telephones 1 and 4 reflect that the DTO associates know of and are assisted PEREZ III in receiving packages at their residences. Interceptions over Target Telephones 1 and 4, pen register information, and surveillance established that XINA facilitated delivery of some of the packages to MA and MARY YANG, XINA's relatives. Finally, based on physical surveillance, most of the packages received by the DTO were transported primarily to PEREZ JR.'s prior residence and MA and BUB's current residence (420 E. Morgan Avenue); and, residences believed to be serving as a DTO stash locations, (2100 W. Pierce Street, Apartment #201), Hector ARENAS's residence (1724C S. 6th Street), and MARY's residence (4748 N. 49th Street).

33.     With respect to the FedEx packages, (1) PEREZ III routinely tracked many of these packages on his cell phone and expressed concern for some of the

packages' whereabouts when they failed to arrive in the expected timeframe, which was reflected in intercepted communications over Target Telephone 1 with Fed Ex; (2) interceptions on Target Telephones 1 and 4 established that PEREZ III coordinated the delivery and retrieval of the packages among the DTO members; (3) based on surveillance, the DTO used multiple members, vehicles, and counter surveillance techniques to retrieve packages from the various addresses in Milwaukee, Wisconsin; (4) at least some of the packages were in the name of aliases; and (5) upon receipt of at least one of the packages, PEREZ III, using Target Telephone 1, called SANCHEZ to confirm receipt. Based upon their training, experience, and familiarity with this investigation, case agents believe that the FedEx packages contained a large quantity of controlled substances because of the above-described manner where PEREZ III distanced himself from these packages.

34. On April 29, 2020, two DTO-related packages were intercepted. Case agents seized one package from FedEx, which package was searched pursuant to a warrant. This search revealed approximately 9.64 pounds of marijuana and approximately 237 grams of THC oil, which was packaged in one-gram quantity plastic containers. Later that same day, UPS, in accordance with UPS policy, opened another box that smelled of marijuana. The package contained approximately 2,029 grams of THC oil, which was also packaged in one-gram quantity plastic containers. UPS then contacted law enforcement regarding the contents of the package. Case agents thereafter seized this UPS package.

15

35.    Throughout April 29 and 30, 2020, both PEREZ III and XINA contacted FedEx and UPS numerous times, inquiring about the whereabouts of the packages that had been intercepted. On May 1, 2020, after learning about the interceptions of the two packages containing controlled substances, PEREZ III changed both of their phone numbers, and SANCHEZ changed his phone number.

36.    In early April 2020, DHL opened five packages that arrived to its facility from Hong Kong and that were destined for at least three separate addresses, including PEREZ JR.'s prior residence and HART's prior residence. Because the packages were sent internationally from Hong Kong, Customs and Border Patrol (CBP) opened the packages, revealing hundreds of "West Coast Cure CUREpen – 1000 mg THC," "Rove Tangy Sativa," and "Rove Dream Hybrid," vape cartridge boxes, which included plastic inserts designed to hold vape cartridges that contain THC oil. Based upon case agents training, experience, and familiarity with the investigation, case agents believe the cartridges are commonly used to consume THC oil through "vaping."  Two of the packages were addressed to "Luis Perez, 420 E. Morgan Avenue, Milwaukee, WI 53207 USA." The label on both of these packages listed the following contact phone number for the recipient: (949) 534-2677 (Target Telephone 7), which is a number associated with Miguel SARABIA, SANCHEZ's father. All packages were ultimately delivered to the respective residences.

37.    Based upon the investigation, including the incoming shipment of THC oil as well as the CUREpen and Rove vape cartridge boxes, and the intercepted

communications wherein the DTO members discussed the acquisition and assembly of the vaporizing pen parts, case agents believe that the DTO manufactures and distributes "vape cartridges" containing THC oil in the Milwaukee area. Specifically, case agents believe that the DTO purchases the pen vaporizer parts individually, filling and/or assembling the cartridges with THC oil shipped from California and putting the cartridges in the "West Coast Cure CUREpen" and "Rove" boxes.

38.     Additionally, case agents obtained a search warrant for PEREZ III's iCloud account. After reviewing the information received as a result of the search warrant, case agents found an email, dated October 19, 2019, from PEREZ III and XINA's previous landlord. The landlord expressed a concern regarding drug activity at 24 Rose Lane, Vallejo, California, a residence PEREZ III and XINA's were renting at the time. Attached to this email was a photograph depicting a "Shark 710" oil filling machine.  Case agents' online research revealed that the "Shark 710" machine is marketed to the Cannabis and CBD oil market and is priced between $13,000 and $15,000.  The machine is fully automated and is capable of filling 100 cartridges in an average of 30 seconds. Furthermore, based upon surveillance and interceptions over the Target Telephones, case agents believe that various DTO members assisted the DTO with the manufacture of the vape cartridges at MARY YANG's residence at 4748 N. 49th Street, Milwaukee.

### C.    Stash Locations

39.    On April 10, 2020, case agents installed a remote camera at the DTO's suspected stash apartment, the Knitting Factory Lofts, located at 2100 W. Pierce Street, Apartment #201, Milwaukee, Wisconsin (the Pierce Street stash apartment).

40.    In the early morning hours of April 12, 2020, case agents obtained six large black garbage bags from the dumpster in the parking lot associated with the Pierce Street stash apartment, four of which were determined to be associated with Apartment #201. An analysis of the remote camera footage by case agents revealed that numerous black garbage bags were removed from the apartment.  Case agents recovered a total of 498 "Shield N Seal" brand vacuum sealed bags some of which continued to maintain the odor of fresh marijuana.  Based upon their training and experience, case agents know that the bags recovered from the garbage are commonly used to transport marijuana, and each individual bag, when full, holds approximately one pound of marijuana.  Further, case agents observed that the inside of each bag was wet and appeared to have been rinsed out to remove any marijuana residue.

41.    Based upon their training, experience, and familiarity with this investigation, case agents believe that the PEREZ III DTO used 2100 W. Pierce Street, Apartment #201, Milwaukee, Wisconsin as a stash location. Furthermore, case agents' review of remote surveillance and positional cell phone data revealed that PEREZ III and XINA frequented the Pierce Street stash apartment. Remote surveillance and interceptions over Target Telephones 1, 3, and 4 further reflect

18

that other DTO members have access to and/or have been observed on multiple occasions at the Pierce Street stash apartment, to include Manuel SOTO, Antonio RODRIGUEZ, Luis GOMEZ JR., JASMINE, PEREZ III, XINA, Esteban REYES, Ivan GALAN, HAUSENG YANG, PEREZ JR. (prior to reporting to prison), and several other unidentified individuals. On various occasions, the DTO members, including SOTO, RODRIGUEZ, GOMEZ JR., PEREZ III, and REYES, along with other unidentified individuals, have been observed carrying both into and out of the stash apartment large boxes and bags, which case agents believe are associated with the DTO's marijuana trafficking.

42.     Case agents believe that, in addition to the Pierce Street stash apartment, PEREZ III also used Hector ARENAS' house, 1724C S. 6th Street, as an additional "stash" location for storing the DTO's controlled substances. Case agents have observed PEREZ III bring boxes to ARENAS's house. Case agents have also observed PEREZ III walk in and out of ARENAS' house with duffel bags before engaging in what case agents believe to be drug transactions. Case agents have observed other DTO members at this residence. These members include SOTO, RODRIGUEZ, GOMEZ JR., PEREZ III, XINA, MARY, GER YANG, and REYES. During numerous hours of surveillance conducted at the residence, case agents have observed many instances of drug trafficking activity, including but not limited to, packages and bags going in and out of the residence.  Additionally, in a court-authorized intercepted communication over Target Telephone 1 between PEREZ III and ARENAS, as detailed below, ARENAS informed PEREZ III that police may be

19

in route to his house. PEREZ III then directed ARENAS to hide the guns and any other contraband in the basement, lock the doors to the house, go outside, and refuse officers entry to his house.

43.     On May 30, 2020, at 11:58 p.m., ARENAS, using (414) 366-2797, called PEREZ III, using Target Telephone 1. During this call, ARENAS advised PEREZ III that ARENAS and his girlfriend had been involved in an argument and ARENAS's girlfriend called the police. ARENAS stated, "…she was calling the cops, [U/I] that I am a drug dealer and all types of shit bro." Later in the conversation ARENAS stated, "She was beating my ass bro so if they come here bro and they c--, Imma wait outside. I'm not gonna let them come in or knock on my door." Based upon their training, experience, and familiarity with the investigation, case agents believe that ARENAS informed PEREZ III that ARENAS had been involved in a physical altercation with his girlfriend, and he was worried that she told the police ARENAS was a drug dealer. Further, ARENAS informed PEREZ III that ARENAS was not going to let the police enter the residence and would wait outside for the police to arrest him.

44.     In response PEREZ III stated, "No, lock everything in your house dawg, lock the doors. Then put everything-put the guns, put all the guns downstairs. Grab your keys man and hide 'em bro. Hide them somewhere outside dawg." ARENAS asked, "Hide what outside?" PEREZ III replied, "Like lock your doors. Lock all your doors to your house and go outside, bro, and then just grab your keys and put 'em in the bucket outside bro." Based upon their training, experience,

and familiarity with the investigation, case agents believe that PEREZ III told ARENAS to lock up the stash house and hide all of the stored guns. PEREZ III also directed ARENAS to hide the keys so that the police couldn't access the house. ARENAS replied, "Alright. [U/I] guns right now dawg." PEREZ III replied, "Yeah, just put the all guns in the basement, bro." Case agents believe that at the direction of PEREZ III, ARENAS hid all of the guns stored at the residence in the basement at 1724C S. 6th Street.

**D.    DTO Sends Drug Proceeds Through USPS to California**

45.    To date, case agents have determined that DTO members, including, but not limited to PEREZ III, XINA, and SANCHEZ use the U.S. mail to send and/or receive drug proceeds collected in the Eastern District of Wisconsin and shipped to various locations in California.

46.    United States postal records, post office video surveillance, and court ordered location data from tracking devices on vehicles used by PEREZ III and XINA reflect that PEREZ III and XINA mailed at least 87 packages, believed to contain bulk U.S. currency, to Julian SANCHEZ in California since December 11, 2019, from the U.S. Post Office located at 5500 S. Howell Avenue, Milwaukee, Wisconsin.

47.    Based upon United States postal records, out of the 87 suspected drug proceeds parcels, all but one were addressed to "Julian SANCHEZ." Some of the destination addresses have been associated with Julian SANCHEZ in law enforcement database, and some of the destination addresses have been determined

to be third party shipping companies that have mailbox rentals. In one instance, SANCHEZ opened a private mailbox using his California driver's license and his U.S. passport.

48. PEREZ III and XINA used aliases and addresses with no current ties to them to ship the packages. For example, sender names on the packages have included "Joe Gonzalez" and "Melany Gonzalez." Examples of the sending addresses have included a former address for PEREZ III as well as a Walgreens pharmacy store located on S. Howell Avenue in Milwaukee, Wisconsin. However, beginning in June of 2020 through early July of 2020, at least 19 packages were sent to SANCHEZ at various locations in California. The sender name on these 19 packages was listed as "Xina Yang" or "Violeta Gonzalez" (the name of PEREZ III's mother), and used the sender address of 1653 S. 57th Street, West Allis, Wisconsin, the primary residence of PEREZ III and XINA.

49. Despite their often time use of alias and incorrect sending addresses, case agents have confirmed that PEREZ and XINA mailed the above-referenced packages because (1) court ordered location data for their vehicles reflect that their vehicles were stopped in the area of the Howell Avenue post office on dates that correspond to the dates on which some of the packages were mailed; (2) video surveillance has captured PEREZ III and XINA mailing parcels on certain dates, which parcels have been identified as the ones mailed to Julian SANCHEZ; and (3) video surveillance has also captured PEREZ III and XINA's vehicles at the post

office on dates the correspond to the mailing dates of some of the above-described packages.

50.     Based upon their training, experience, and familiarity with the investigation, case agents believe that from the intercepted telephone calls and the investigation to date, each of the U.S. Postal packages contain $20,000 in drug proceeds.  As set forth above, case agents have documented 87 packages sent by PEREZ III and/or XINA to SANCHEZ from approximately December 10, 2019, through July 28, 2020. Based upon this analysis, the PEREZ III DTO has mailed approximately $1.7 million in drug proceeds to SANCHEZ in a six-month period.

### E.     SANCHEZ's Role in the DTO

51.     The investigation to date has revealed that SANCHEZ supplied the PEREZ III DTO with bulk marijuana, marijuana oils/waxes, marijuana vape cartridges, and/or other controlled substances, which is then sold in Milwaukee, Wisconsin, under the brand name "Midwest Connect" or "Midwest Connected." Intercepted telephone calls over and location data for SANCHEZ's telephones reveal that SANCHEZ traveled to areas in northern California, to obtain marijuana and marijuana products that he subsequently supplied to PEREZ III on consignment. PEREZ III then mailed drug proceeds or sends money couriers to California to pay SANCHEZ for the previously fronted controlled substances.

52.     During the course of this investigation, case agents determined that SANCHEZ used several cellular telephones, including (707) 888-2991 and (213) 700-0559 (Target Telephone 5), (562) 380-9506 (Target Telephone 6), (562) 306-8581

23

(Target Telephone 8), as well as Snapchat account "officialdjhaze" and Instagram account "lowkeyyterpss" to further the activities of the DTO. Between May 19, 2020, and July 22, 2020, approximately 103 intercepted calls and/or text messages between SANCHEZ and PEREZ III were deemed criminal and pertinent in nature. In addition, between August 6, 2020, and August 28, 2020, approximately 57 intercepted "snaps" and "chats" between SANCHEZ and PEREZ III intercepted on PEREZ III's "Midwest_connect" account were deemed criminal and pertinent in nature.

53.     SANCHEZ is also laundered money generated from the sale of the controlled substances that he supplied to the DTO. First, SANCHEZ, by receiving bulk currency as payment for previously fronted controlled substances, is involved in transactions that are designed to conceal the nature, source, location, ownership, and control of the proceeds.

54.     To illustrate, on April 16, 2020, law enforcement searched two parcels that PEREZ III mailed to SANCHEZ, pursuant to sneak and peek warrants. The search revealed that each parcel contained $20,000 in U.S. Currency hidden in magazines. The money was meticulously taped between the various magazine pages to conceal the parcels' true contents.

55.     Second, SANCHEZ structured cash deposits to avoid the law enforcement detection. To illustrate, on October 26, 2018, SANCHEZ opened U.S. Bank account x122. The account had $56,680 in cash deposits occurring from October 30, 2018, to February 1, 2019. All of the cash deposits, except for a $100

24

cash deposit when the account was opened, were conducted in or around Milwaukee, Wisconsin. The deposits also appeared to be structured in a manner to avoid the filing of a Currency Transaction Report (CTR), which is required to be completed by a financial institution anytime U.S. Currency totals more than $10,000 in a single deposit. For example, on October 30, 2018, at 11:47 a.m., SANCHEZ deposited cash of $9,900 at a U.S. Bank branch on Mitchell Street in Milwaukee, Wisconsin.  At 12:16 p.m., SANCHEZ deposited $5,010 into the same account, but at a U.S. Bank branch on Greenfield Avenue in Milwaukee, Wisconsin. Additionally, on February 1, 2019, Sanchez conducted three cash deposits of $9,900, $9,920, and $9,950 at different times and branches in Milwaukee, Wisconsin.

56.    During this time period, the cash deposited was typically withdrawn in cash from the account within five to six days of the deposit. In total, $56,515 in cash was withdrawn from the account during this time period.  Additionally, the daily location data of SANCHEZ's various cellular phones, since approximately May 2020, is inconsistent with any legitimate employment.

57.    SANCHEZ's role in the DTO is reflected in the following intercepted calls:

a.    On April 7, 2020, at 2:37 p.m., PEREZ III, using Target Telephone 1, called SANCHEZ at (707) 888-2991.  During this call, SANCHEZ told PEREZ III: "That's all good.  What I'm gonna do is mmm, I'm 'bout to drop these boxes and I'm gonna go [U/I] and shit."  PEREZ III replied, "Alright."  Later in the

conversation, SANCHEZ stated, "Hey, send me the address too cause I'mma bout to drop these off." PEREZ III responded, "Alright, I got you bro."

      b.    Based upon their training, experience, and knowledge of the investigation, case agents believe that SANCHEZ and PEREZ III discussed the shipment of packages of controlled substances believed to contain marijuana to PEREZ III, and SANCHEZ told PEREZ III to send the address where the package should be shipped.

      c.    On April 17, 2020, at 12:02 p.m., SANCHEZ, using Target Telephone 5, called PEREZ III, using Target Telephone 1. Towards the end of the conversation, SANCHEZ stated, "I gotta ship all this shit out so I can make money and pay my fucking monthly bills too." PEREZ III then stated, "Hey, call me back, yeah?" SANCHEZ replied, "Yeah, I'll call you."

      d.    Based upon their training, experience and knowledge of this investigation, case agents believe that, during this call, SANCHEZ told PEREZ III that SANCHEZ had to mail packages containing controlled substances to PEREZ III to keep the drug proceeds coming in to make money and pay his bills and suppliers. Case agents further believe that PEREZ III did not want to talk about the packages at that time, and thus interrupted SANCHEZ and asked SANCHEZ to call PEREZ III back.

      e.    On April 18, 2020, at 5:55 p.m., PEREZ III, using Target Telephone 1, called SANCHEZ, using Target Telephone 5. During this conversation, SANCHEZ asked PEREZ III, "Hey, what was it two twenty (220)? or

26

what?" PEREZ III replied, "Yeah I think so, two twenty (220)." SANCHEZ stated "Alright."

      f.      Based on their training, experience, and knowledge of this investigation, case agents believe that this call is in reference to the two USPS packages PEREZ III sent to SANCHEZ on April 15, 2020. On April 16, 2020, both packages were searched pursuant to sneak and peek warrants, revealing $20,000 U.S. Currency hidden in each package. Therefore, case agents believe that SANCHEZ was inquiring with PEREZ III as to how many packages were sent and how much was in each package. ("Hey what was it two twenty (220)? or what?"). Case agents further believe that PEREZ III confirmed the contents of the two packages he sent to SANCHEZ. ("Yeah I think so, two twenty (220).").

      g.      On May 16, 2020, at 9:43 p.m., SANCHEZ received an incoming call on Target Telephone 5, from M. SARABIA, his father, using Target Telephone 7. During this call, SANCHEZ and M. SARABIA discussed numerous topics, including SANCHEZ's Airbnb account. Case agents know, from intercepted calls over Target Telephones 1 and 5, that at the time of this call, SANCHEZ rented an Airbnb in northern California and was waiting on large quantities of marijuana. During the conversation, M. SARABIA stated, "I still don't know if it was tracking still for his-his shipment." SANCHEZ replied, "Oh that's good." M. SARABIA stated, "The-the carts. The other ones I'm not gonna send it to him yet though. 'Til they [U/I]." SANCHEZ replied, "Man. He'll pay you or I have a [U/I] I don't [U/I] either one." M. SARABIA stated, "Our shit's almost ready." SANCHEZ replied, "Oh

27

yeah?" M. SARABIA responded, "Besides the other one's I'm missing but…" SANCHEZ replied, "It's coming together man." M. SARABIA replied, "yup."

      h.     Case agents believe that, during this call, M. SARABIA and SANCHEZ discussed the shipments of empty vape cartridges and vape boxes shipped to Milwaukee, Wisconsin, from Hong Kong. Case agents further believe SANCHEZ is referring to PEREZ III and the money PEREZ III owes M. SARABIA when SANCHEZ stated, "Man. He'll pay you."

      i.     Later in the conversation SANCHEZ continued, "Yeah, I think that shit is super fucked up nigga. I was like bro, what's up? He started talking to his homies and shit. I think he said this Monday or next Monday everything at 100%. It'll ready two-hundred so I'm driving two-hundred, dropping the bitches and that's it. I'm going the fuck home and then talk to JC hopefully fix that and get-get the ball rolling on this. On the inside cause it dry as fuck up here, man. It be dry for like a month or two and then come back up here for a four box order—from there four to two we go down to L.A. do two, three boxes and then that's when it's going to ramp up again." SANCHEZ replied, "When's he gonna kick off his carts? Is he already making 'em?" SANCHEZ replied, "Oh. He's already doin it. I know because they were dry on carts and now there's carts plus posting up." M. SARABIA replied, "What carts he posting up?" SANCHEZ replied, Mmm. Right now, V-V-S's. Yeah, nothing just [U/I] V-V-S's and uh, the West Coast Cures."

      j.     Based upon their training, experience, and knowledge of the investigation, case agents believe this conversation pertains to SANCHEZ's plans to

obtain 200 pounds of marijuana for PEREZ III and shipping it to Milwaukee. ("I'm driving two-hundred, dropping the bitches and that's it"). Case agents know that a "box," as used above, is a common term used to describe one hundred pounds of marijuana. Further, case agents believe that M. SARABIA asked when PEREZ III was manufacturing the cartridges containing THC oil, ("When's he gonna kick off his carts? Is he already making 'em?"), and SANCHEZ told M. SARABIA that PEREZ III was already making them, ("Oh. He's already doin' it").

      k.      On June 24, 2020, at 7:36 p.m., SANCHEZ, using Target Telephone 5, received a call from an unidentified male, using (831) 750-7120 (UM7120). During the call, SANCHEZ stated, "What up? I had to tell you. Cancel that trip cause I'm fucking stuck up here." UM7120 asked, "What do you mean?" SANCHEZ replied, "Fucking, I told my guy I would stay up here and dry up all the OGs. So, they're holding me to me to my fucking word. So, I think." Case agents are aware that OG is a slang term for marijuana and that SANCHEZ needed to stay in northern California to obtain the marijuana that SANCHEZ promised to purchase for PEREZ III ("my guy."). UM7120 asked, "How many more you gotta get?" SANCHEZ replied, "Uh, fuck. I'm almost done clearing them out. I got like three more weeks. That's only two, three more boxes. He held me to my word. Man, you fucking dick. He's like bro, you know. So, you told me bro you were [U/I] until the O's were done. I was like damn." UM7120 laughed and SANCHEZ continued, "This nigga. And bro I'm just trynna make your pockets fatter, bro. Blah, blah. blah, blah. Man, shut up nigga I wanna go home. . . . [U/I] wanna keep going [U/I] ragging bull

bro. I told him right after these OG's bro don't talk to me about no 'come take a run' cause it's already July, I don't wanna hear nothing."

l.     Case agents know that the term "box" is a common term used in reference to a 100 pound quantity of marijuana. Further, case agents believe that SANCHEZ was talking about PEREZ III making SANCHEZ stay in northern California to get the additional 200-300 pounds of marijuana ("That's only two, three more boxes"), but that SANCHEZ wanted to go back home to Los Angeles.

m.     On July 5, 2020, at 10:09 p.m., SANCHEZ, using Target Telephone 6, received a call from J. SARABIA (a/k/a "Goofy"), using (562) 284-7435. During the call, SANCHEZ and J. SARABIA discussed how the prices of marijuana had increased and that the market is good. SANCHEZ and J. SARABIA discussed how MATTESON needed guidance in the drug trafficking business. SANCHEZ stated that MATTESON has "drive" but he's not "ready," meaning ready to be fully involved in drug trafficking activities. SANCHEZ stated that MATTESON and SANCHEZ had become closer in their relationship as a result of their joint involvement in the marijuana business. SANCHEZ owed MATTESON $2,000 and SANCHEZ was paying MATTESON whatever was owed to him. J. SARABIA told SANCHEZ that J. SARABIA would keep his word when if it ever comes to SANCHEZ "getting locked up." J. SARABIA will be there and will "bail him out." SANCHEZ stated that he "appreciates it" and stated that he knows his dad (Miguel SARABIA) won't have his back. SANCHEZ stated that MATTESON has been the one telling SANCHEZ about his dad. SANCHEZ continued to explain how hurt

SANCHEZ was and cannot believe M. SARABIA didn't think SANCHEZ would find out that his dad was a "rat," especially now that SANCHEZ and MATTESON are so close. SANCHEZ told J. SARABIA that SANCHEZ "doesn't respect rats." J. SARABIA stated that M. SARABIA is still his dad; he's still family. SANCHEZ can be upset, but "family is family." Case agents believe that during this conversation, SANCHEZ had recently learned that his father, M. SARABIA, had cooperated with law enforcement in the past and SANCHEZ was upset.

n.     SANCHEZ told J. SARABIA "*Uncle*, what hurts the most -- *uncle,* what hurts the most, Imma be real with you, *uncle*, what hurts me the most is I brought him into my line and he's helping out my line. He ain't not gonna give me money in my line, *uncle*. I know what's up with this nigga. He's already sending liters and edibles to my line and not tell me 'bout it? But hey *uncle*, I don't give a fuck. That five thousand dollars ($5,000), that's just little money to me. I touch real money, *uncle*. I don't give a fuck about that shit, real talk. That nigga can wash that shit and wipe his ass. I don't give a fuck, straight up."

o.     Case agents believe that SANCHEZ is making reference to SANCHEZ bringing M. SARABIA into the PEREZ III DTO ("my line") and that M. SARABIA is sending "liters" of marijuana wax and marijuana edibles to PEREZ III and not telling SANCHEZ about it or cutting him in on the profits ("sending liters and edibles to my line and not tell me bout it?"). In addition, case agents believe that M. SARABIA is laundering drug proceeds for the PEREZ III DTO ("That nigga can wash that shit.").

31

p. Further, during the same call, SANCHEZ and J. SARABIA discuss how "Ocho" (PEREZ III) is "so loyal." SANCHEZ found out through PEREZ III that M. SARABIA was selling PEREZ III "liters," which case agents believe to be marijuana oils. SANCHEZ explained that SANCHEZ cannot understand how his dad didn't even tell him, especially now that he's back in Los Angeles. SANCHEZ explained that SANCHEZ's grandmother has a saying for M. SARABIA, "whenever he sees an opportunity he takes it." SANCHEZ stated that SANCHEZ believed PEREZ III will not side with M. SARABIA over him.

q. Case agents believe that, based on this conversation, as well as intercepted communications, that SANCHEZ and M. SARABIA are both supplying PEREZ III with marijuana-related products independently of each other, and that M. SARABIA is going behind SANCHEZ's back to supply PEREZ III with other controlled substances.

r. SANCHEZ and J. SARABIA continued to talk about family issues, including their distrust for M. SARABIA. SANCHEZ stated he cannot associate with M. SARABIA because SANCHEZ has "too much to lose" and that SANCHEZ believed that M. SARABIA will "sink him" if M. SARABIA keeps dealing with PEREZ III. SANCHEZ told J. SARABIA that the hard part for SANCHEZ would be to let "Ocho" (PEREZ III) know "I don't want you fucking with my pops" and that it didn't look good for SANCHEZ to talk to PEREZ III about his "family problems." SANCHEZ told J. SARABIA, "You need to understand, uncle, Imma switch my car out cause this nigga gave me a car and I don't know what the fuck

32

this nigga be doing. Like, a tracker." Based upon their training, experience and familiarity with the investigation, case agents believe this to mean that M. SARABIA gave SANCHEZ his vehicle and that SANCHEZ was now worried that, because M. SARABIA had cooperated with law enforcement, SANCHEZ possibly had a GPS tracking device attached to the vehicle.

### SANCHEZ Arrest and Seizure of Device 1 and Device 2

58.     On September 18, 2020, the Honorable Stephen Dries, United States Magistrate Judge for the Eastern District of Wisconsin, signed a federal arrest warrant for SANCHEZ based on SANCHEZ's role in this DTO.

59.     On September 22, 2020, SANCHEZ was located and arrested by the California Highway Patrol while operating his red 2015 Chevrolet Tahoe bearing WI registration ATZ6893.  While conducting an inventory search of SANCHEZ's vehicle, case agents located **Device 1** and **Device 2** within the vehicle and determined that **Device 1** and **Device 2** belonged to SANCHEZ.  Case agents seized **Device 1** and **Device 2** at that time.

60.     **Device 1** and **Device 2** are therefore currently in the lawful possession of DEA.

61.     **Device 1** and **Device 2** are currently in storage at High Intensity Drug Trafficking Area at 801 W. Michigan Avenue, Milwaukee, Wisconsin.  In my training and experience, I know that **Device 1** and **Device 2** have been stored in a manner in which its contents are, to the extent material to this investigation, in

33

substantially the same state as they were when **Device 1 and Device 2** first came into the possession of the DEA.

## NEXUS BETWEEN USE OF CELLULAR PHONES AND CRIMINAL ACTIVITY

62.     Through affiant's training, experience and discussions with other experienced law enforcement officers, affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

63.     Based upon my training and experience, affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

64.     Based on my training and experience, affiant is aware that individuals involved in trafficking controlled substances often possess multiple cellular devices to compartmentalize their illegal activity and to avoid law enforcement detection.

65.     Based upon my training and experience, affiant believes it is common for crime suspects who possess illegal controlled substances and firearms to often

34

take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell; furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

66.     Based upon the facts described above, I believe that SANCHEZ used his cellular phones to facilitate controlled substances transactions, and evidence of drug trafficking may likely be stored and recorded on the **Device 1** and **Device 2**. More particularly, I believe that there is probable cause to believe that a search of the information contained within **Device 1** and **Device 2** described above will produce evidence of a crime, namely evidence related to the possession and trafficking of controlled substances.

## TECHNICAL TERMS

67.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

35

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer

36

connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

68. Based on my training, experience, and research, I know that **Device 1** and **Device 2** have the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and it has the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

69. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

70. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Device 1** and **Device 2** was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **Device 1** and **Device 2** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

38

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

71. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Device 1** and **Device 2** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **Device 1** and **Device 2** to human inspection in order to determine whether it is evidence described by the warrant.

72. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I

39

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

73.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Device 1** and **Device 2** described in Attachment A to seek the item described in Attachment B.

# <u>ATTACHMENT A</u>

The property to be searched is described as follows:

1.      a forest green Apple iPhone 11 Pro Max, with an unknown model and serial number, hereinafter referred to as "**Device 1**"; and

2.      a Samsung Galaxy S20 Ultra cellphone, hereinafter referred to as "**Device 2**".

**Device 1** and **Device 2** are currently located at High Intensity Drug Trafficking Area, 801 W. Michigan Avenue, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **Device 1** and **Device 2** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.    All records on **Device 1** and **Device 2** described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, and 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957, and involve Julian SANCHEZ, including, but not limited to:

    a.  lists of customers and related identifying information;

    b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.  any information related to co-conspirators and sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.  any information recording schedule or travel;

    e.  all bank records, checks, credit card bills, account information, and other financial records;

    f.  Photographs and/or video depicting possession of drugs;

    g.  Any evidence related to either the ownership, purchase, or possession of drugs; and

    h.  Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    Evidence of user attribution showing who used or owned **Device 1** and **Device 2** at the time the things described in this warrant were created, edited, or

1

deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.